May it please the Court, my name is Kevin Ross. I represent Jesse Blankenship. Yes, sir. Today, I'd like to discuss with the Court some sentencing issues, particularly that affect Mr. Blankenship in the sentencing guideline range, that if the Court were to agree, would reduce his sentencing guideline to that of less than life in prison. I think the strongest argument to be made that I could lead off with is the enhancement that was given to Mr. Blankenship in regards to the use of a dangerous weapon. In this regard, the guidelines in 2A4.1B3 gives a two-level increase if a dangerous weapon was used. Now, the testimony from the trial was that Mr. Jones did not see a weapon, a firearm, until he got into the car in which he sat in the passenger seat, and Mr. Blankenship was in the back seat behind the driver's side. And it was at that time that he saw a gun, i.e., it was visual, brandished, perhaps, you could say. However, to apply . . . Could you repeat that? I didn't hear your word. Yes, so . . . Something you might say. I'm sorry? Could you say brandished, you might say? Brandished, you might say. He saw it. It was visible. It was displayed. But the guideline is clear in its definitions that to apply the dangerous weapon enhancement under 2A4.1, that it has to be more than brandishing, displaying, or possessing a firearm. And it goes to that aspect of otherwise used. Does this make any difference when he gets a life sentence? Your Honor, I think it's important because even though the judge gave him a life sentence, if we . . . if his guideline range goes down, then it's not life, it could be less than life. I mean, do you . . . did you calculate that? I'm just wondering. Your Honor, I didn't go through all the specifics. I just went through the overall aspect of if these were granted, his guideline range would have been less than the life, which is at the very end of the guidelines. So in essence, Your Honor, it becomes a possibility. But more importantly, the court needs to properly apply the guidelines. And in this particular case, it did not. Your Honor, it's clear from the record, I'll issue some trial sites for the court to look at. So the record on it, 3252, 3253, 3229, Your Honor, it's . . . when you look at otherwise used, that's what the government will say is, you know, it's used because of intimidation aspect. But there's no intimidation with the use of this gun as to Mr. Jones. It's just clear as day in the record. Cases that this court . . . How do you draw that inference that it was no intimidation to Mr. Jones if he sees the man sitting behind him with the pistol? So, when the definition of otherwise used, brandish, has to be more than brandish. The intimidation comes with that specific act of like pointing. If you're pointing, that's the intimidation, Your Honor. Knowing that he's a member of this extraordinarily violent gang and that he has the power, he was on the task force or not? He was trying to get on the . . . He was trying. Correct. He's a major. They know he's . . . he knows he's going to lose his patch. My first thought was that that heated up rod was the dangerous weapon. But anyway, doesn't that figure into the, you know, the overall circumstance of the case? You know, I can answer that both ways. I think it cuts both ways. Because he knew that, he probably knew that he had a gun, right? I mean, given the fact that he could be violent and things of that nature, so it's not something that he was intimidated by because he sees this guy in that regard. But here's really my point. In Dunigan, Your Honor, it says that displaying a weapon without pointing or targeting should be classified as brandished, but pointing the weapon at any individual or group of individuals in a specific manner should be otherwise used. The cases that this Court has cited, in the Dunigan case, Williams, Payne, and Orr, all had the common denominator of the weapon was pointed at an individual. So clearly, that's in the otherwise used. In this particular case, it was not. And I think that that is important here. There is no . . . you look at the trial testimony as well from Jones. He talks about him going willingly at one . . . or telling the agents that he went willingly. And then he wanted to get this over with. So the idea of intimidation, because of this firearm, I don't think is present, Your Honor. So I think if the Court looks at the definitions of otherwise used, the definitions of using a dangerous weapon, in this particular case, the weapon was never pointed. It wasn't as if Mr. Blankenship was sitting next to Mr. Jones, you know, so he knows and he's looking over the corner that this . . . I'm intimidated by this. So that's a two-level increase, Your Honor, that should go away in that regard. The other aspect in this case is the two-level enhancement for the leadership role. In looking at that, in Exhibit 500, there is a hierarchy of the Aryan Circle. It is a very structured organization. There's the upper room group, and those are the people that get to call all the shots. Those are the leaders, organizers, supervisors, in a sense, in the upper room. Then you have the middle group. And then you come down. As you go down, you get to the definition of, or the category of major. And that's two levels below just a member. And I would argue to the court that in this hierarchy of the Aryan Circle, it's more of a managerial role of managing people underneath him as a major rather than a leader's organizer role where he's getting to call those shots. The upper room is the group that said, hey, we're going to order a hit on this person. Discipline that person. You do this. You do that. They were giving orders down the chain. And as a major, he was in more of a managerial capacity to make sure that those orders were carried out, in essence. And so in the hierarchy, as you can see in Exhibit 500, a three-level enhancement for me, I would argue, is more appropriate in the structure of this organization than that of a four-level role of leadership. He was in charge of the prisons in Missouri, right? He was in the managerial capacity of overseeing the Missouri that was given to him by the leaders of the organization in the upper room as they got to make those decisions. And I say that my time is up. All right. Thank you. Thank you, Judge. Mr. Franklin is next. I'm just wondering, is Mr. Chun still in Beaumont? No, Your Honor. I believe he's in Colorado currently. Oh, you would think they'd finally catch on. May it please the Court, I'm Eric Franklin. I represent Appellant William Glenn Chun. This Court should reverse the trial court because Mr. Chun was denied effective assistance of counsel. And they should find that that was prejudicial. Because he was not effectively assisted by counsel, the trial court's denial of the motion for continuance was also improper. The Sixth Amendment right to effective assistance of counsel has an elevated status among fundamental constitutional rights, principally because it affects the defendant's ability to assert other rights they may have. The Strickland v. Washington Court found that any actual or constructive denial of assistance of counsel is legally presumed to result in prejudice, as do certain state actions. Powell v. Alabama firmly established that the Constitution requires the guiding hand of counsel at every step of proceedings against a criminal defendant, even if that defendant is an educated or intelligent layperson. Because this right's so fundamental, a court may overturn a judgment for denial of benefit of counsel on its own, or it may determine there was a due process violation, or both. So, the Supreme Court has found that . . . I'm sorry. We're all looking. We're all scrambling to find an effective assistance of counsel issue. Your Honor, in our first point, we talked about the . . . perhaps I'm stating it differently, but the fundamental issue in our first point was he was denied his Sixth Amendment right to assistance of counsel because the Bureau of Prisons failed to give Mr. Montalvo, his defense counsel, access to Mr. Chun. The basis for the motion for continuance that Mr. Montalvo filed was that he had not been allowed to meet with Chun. He cataloged that Chun had been transferred to the prison in July, that he had been limited to one visit per week. The core issue here is not ineffective assistance by Mr. Montalvo. That's not what we're arguing today. What we're arguing is that Mr. Montalvo, and this goes to United States v. Chronic, Mr. Montalvo gave competent representation, but what happens when a competent counsel is still unable to effectively assist in reviewing discovery? That was the prime basis for the motion for continuance. Mr. Montalvo stated on the record that he needed Chun to assist him in reviewing the discovery and that it would be helpful to him in his defense of the case. At that point, the court had an opportunity, the opportunity to grant the motion for continuance, realizing that Chun had only been in Beaumont and had access to his counsel from mid-July to September 26th when they filed the motion for continuance, or September 16th, excuse me, when he had got permission from the Supervisor of the Attorney Bureau of Prisons to meet with Chun. On September 18th, he filed a motion for continuance, but the trial went forward anyway. At that point, the court could have cured the fact that Mr. Montalvo had been prevented from visiting Mr. Chun. The testimony from Mr. Montalvo, excuse me, the statements from Mr. Montalvo established that he had phone calls with Mr. Chun, but he was only able to speak with him about once a week. From the time Chun arrived in July to September 18th when he filed the motion for continuance, that would have been about nine to ten meetings total. Mr. Montalvo testified, excuse me, he stated at the hearing that Chun had only reviewed two to three percent of the discovery materials, which left around 48,500 pages of discovery unreviewed by Chun. The government argues Chun and his counsel had nine months to prepare for trial, but the amount of calendar days are irrelevant as regards whether Chun had the guiding hand of counsel throughout the process. The fact that . . . Your position that if you don't have five years to read three million pages, that you don't have an effective trial, I mean, that you have to be able to read every single page and it doesn't need to be organized or distilled for you? What would be different in the trial strategy had the access to discovery been more robust? Your Honor, we're left to conjecture how it would have been different. That's part of the issue. There were 48,500 pages of unreviewed discovery here. In United States v. Chronic, the court addressed what happens when it is left to conjecture. It said that effectively there are certain surrounding circumstances where a court may presume ineffectiveness and also that it was prejudicial. In Chronic, the court did not say that he was denied assistance, but it did say that . . . You'll be able to raise all this, Chun will, assuming the conviction is upheld in a 2255, but frankly, I mean, a lot of what you're telling us is not in your brief. As I apprehended, the reason Mr. Chun may have been denied some kinds of access, certainly to the documents, was that they were afraid that whoever was talked about or had participated in creating those documents was not going to have a very long life. So the court did have to balance those factors. Your Honor, two points. Section 1A of our brief addresses the fifth and sixth, the assistance of counsel and the due process violations. As regards the denial of Mr. Montalvo's motion to allow Chun to independently review discovery, the court, at the hearing, Mr. Montalvo said he would be able to comply with the protective order, that Mr. Chun had a similar case in Mississippi and that his proposal was granted there, that it did comply with the protective order there. The trial court, in denying that motion in the Eastern District of Texas, reiterated the purpose of the protective order, stated it was for confidentiality, curb harm, limit improper influence and protect potential witnesses, but it failed to address how that motion, how Montalvo's motion would violate the order, particularly in light of the fact that Mr. Chun could comply with it, that it could comply with it. So there's no evidence on the record of how or why the proposal of letting Chun independently review on a computer would have actually violated the protective order. I don't have a constitutional right to whatever method you think is good. The fact that it's not, but anyway, I don't know if it's even properly before us. Your Honor, if I may respond, the courts have found in three different scenarios a presumption of prejudicial denial of counsel, and that has been in an interruption or interference in a critical stage, it has been when there's been a fundamental right assessed and there's been when government, certain type of government actions have interfered with assistance of counsel. So it's really denial of counsel, not ineffective assistance of counsel. Yes, Your Honor, Strickland calls it assistance of counsel, but that, again, I apologize for my misstatement. It is not, this is the issue raised in Chronic, which is that it's not ineffective on the part of his trial counsel, it's effective trial counsel that was denied access to his preparation for trial. Okay, well, your red light's on, so you have time for rebuttal. Ms. Reed. Good morning, Your Honors. May it please the Court. Mahogany Reed for the United States. I'll start with the continuance issue unless the Court would like me to start elsewhere. As we explained in our brief, the district court acted well within its discretion to deny the defendant's request to continue their trial a sixth time. The district court's determination that none of the relevant factors favored a continuance, I think is borne out by the record, and I'd like to focus on three points. First, contrary to the defendant's and specifically Mr. Chunn's contention, they had more than adequate time to prepare for trial. I take Mr. Chunn's point that he didn't have an opportunity to meet in person with his counsel for a little more than a month out from trial, and we don't have any basis to dispute that, but we do think that the month and a week out from trial that counsel had to meet with Mr. Chunn was more than sufficient under this Court's case law. To my second point, I think it's important that the government made discovery available to the defendants and their counsel from the very beginning of this case. We outlined the nature and extent of those accommodations in our responses to Mr. Chunn's second continuance motion, and I think in response to Mr. Blankenship's continuance motion as well. We directed them to relevant portions of the discovery. We provided searchable discovery indexes to aid in review. We permitted defense counsel to inspect the majority of Jenks Act materials for more than a month at the federal facility where he was housed, and so we think that the government's attempts to provide discovery on a timely, more than timely basis to the defendants and to aid in their review weighed against granting the defendants a sixth continuance. And third, the defendants have failed to establish prejudice. We explain this in our brief, but we think this Court's cases require the defendants to specify how their inability to review discovery affected their performance at trial, and they haven't even attempted to do so at trial. I think Mr. Chunn in particular would be hard-pressed to do so where he allocated at his sentencing hearing that he believed his counsel thoroughly cross-examined multiple witnesses and successfully, in his view, impeached multiple witnesses. To the extent Mr. Chunn asked this Court to presume prejudice on his constitutional claims, we maintain that those claims aren't preserved, are not properly before this Court. The ineffective assistance of counsel claim was not adequately pressed and would not be proper for review on direct appeal in any event. But on the merits, I haven't had a chance to go back and read all the cases cited in chronic footnote 25 where courts may presume prejudice, but I can confidently represent that this case is not of the same mold as those cases. I think chronic itself undermines Mr. Chunn's argument that he can readily establish prejudice here where, again, the district court granted multiple continuances and the defendants had the aid of the government in reviewing discovery. If the Court has no questions, I'll go to the sentencing issues raised by Mr. Blankenship. You know, we think that the district court did not clearly err in applying the dangerous weapon enhancement. As some of the questions from Judges Jones and Elrod suggested, you know, we think that Mr. Blankenship's use of the firearm did constitute an otherwise use in this context, and it really boils down to the context of his use, right? We don't dispute the testimony establishes that Mr. Blankenship took the firearm out of his waistband and placed it on his lap when he was seated in the backseat of the car behind Mr. Jones, but it was the, and the district court determined that it was the continued placement of the firearm on his lap that served to do more than intimidate Mr. Jones. It served to serve as, it served as a continuing threat of harm to Mr. Jones. I think Mr. Jones testified that he understood the context to be that if he attempted to use the firearm, it would be his life or at least a substantial harm to him. And so we do think that that constitutes other, an otherwise use of a firearm more than brandishing of the firearm. In the enhancement, um, in, in the, in the guidelines on the, you know, about the enhancement that would say that you have to actually point it at someone. No, Your Honor. Um, I think, um, um, Mr. Blankenship cited this court's decision in Donegan where the cases to determine that, um, that action, um, uh, takes, um, brandishing to an otherwise use, but the court has never said in the text of the guidelines, certain certainly doesn't require that a defendant has to point the firearm for a brandishing to be an otherwise use of the firearm. The question is whether the use of the firearm, um, creates an individualized threat against the victim. If we were, if we were to reverse it, would a reversal of the two, two level, uh, enhancement make any difference? I think it would, um, it would take Mr. Blankenship's adjusted offense level from a 44 to a 42, which combined with his criminal history category of six would be a 360 to life guidelines range and the district court did not say that it would impose, uh, a term of life even if it made an error in the guideline calculation. And so we do think that if you disagree with us on the otherwise use enhancement, um, resentencing would be appropriate. Could I ask a quick question about the serious bodily injury enhancement? Yes, Your Honor. Um, the, I, do you agree that the guidelines says serious bodily injury must include extreme physical pain? Yes, Your Honor. Does the fact that they gave him drugs ahead of time to medicate him and that he said he didn't, he actually said he didn't feel anything mitigate against him receiving, getting this enhancement because there wasn't extreme physical pain because the guy himself, the gentleman said he didn't feel anything and he was all drugged up. He took the hit on the bong and I think had meth too or something. Right, Your Honor. I don't think that mitigates, um, or, or, uh, establishes an error in applying the enhancement. The question is whether, uh, on the record as a whole, the government established that the, uh, the enhancement was applicable by a preponderance of the evidence. How would it be applicable if the gentleman said he didn't experience pain? Explain that. Well, I don't think he said he didn't experience pain. I thought he said he didn't feel anything. I don't, I don't think he quite said he didn't feel anything. He did say that he, um, hit the meth pipe and he hit the weed pipe was his testimony in an attempt to, um, numb the pain, but I don't think he's, he explicitly said he did not feel pain. Um, um, but you know, I think it's important that the district court was present for that testimony. Um, the district court was able to make, um, uh, you know, a credibility determination about what weight to give that testimony against the description of the, uh, application of the red hot metal rod to Mr. Jones's torso and the tattooing over the torso, uh, to determine that, um, extreme, uh, Mr. Jones experienced extreme physical pain, um, notwithstanding his testimony that he, uh, was, uh, was under the influence with the attempt to, um, ameliorate any pain. Okay. Okay. And this was on his torso, not on. Not on his arm. Yes, Your Honor. I think that was a misstatement in the briefcase. It was on his torso. Because the arm looks the same both before and after. They, we have a pictures of the, nevermind, I'm just. That's right. And, and the district court did consider that as well in determining whether to imply, apply the enhancement. And it determined that because the pictures of the torso or the pictures of the patch, um, uh, were taken multiple, two years after the injury or after the patch removal process, that it didn't weigh against application of the enhancement. Um, but, you know, I think there were some, uh, markings on, on top of, of the patch that the district court, uh, was aware of. Um, and just very quickly on the, um, the leadership enhancement, we do think that Mr. Blankenship, um, uh, was properly assessed a leader organizer enhancement. There was testimony from Brandon Fritz that he oversaw the entire, uh, Missouri Department of Corrections on the Aryan Circle's behalf. He was also a major over the Federal Bureau of Prisons, so all federal prison systems. And he, um, undertook to direct others' actions in his, in, not only in that capacity. I don't think that it's right, um, um, that only, uh, upper board members of the Aryan Circle could be assessed leader organizer enhancement under the guidelines. Don't we have some cases that middle management leaders can get that? Yes. Yes, Your Honor. This Court has assessed the enhancement against captains and majors in other cases as well. Um, unless the Court has further questions, I'm happy to cede the rest of my time. We ask that you affirm. Thank you. All right. Thank you. Okay. Mr. Ross. Thank you, Your Honor. Your Honor, briefly. I just want to be, if I wasn't clear, I want to be clear in regards to the, the brandishing issue. Um, the guideline to apply says that it has to be more than brandishing. And you, in the guidelines on the comment, or 1B1.1 comment note 1C, it says, brandished with reference to a dangerous weapon, including a firearm, means that all or part of the weapon was displayed or the presence of the weapon was otherwise made known to another person in order to intimidate that person. And so, that is the definition of, of brandishing. Now, this Court in Dunegan has been . . . Any evidence was presented in sentencing about intimidation or lack of it? Your Honor, I think it was just from the, from the testimony in regards to, there was what Mr. Jones had said that on, on direct examination, um, that he, based on leading questions, that he really didn't want to go and, um, you know, he knew why they were here. Um, that he thought he was going to get the patch removed. He asked about, you know, going to the tattoo parlor instead of him having it, um, you know, burned. But that was, that was really the basis of it. I mean, that was, that was all. I don't think in essence there was a lot that he was intimidated. In the sentencing, was there any testimony to contradict intimidation or any reference to the Court testimony or any argument about it? Not to my knowledge, Your Honor. Not that I recall. I, I think it was just one of those situations in which, well, I see that my time is, is running down. But the, the point is that Dunigan in this circuit's case law says that you have to point to be more than brandishing, um, and brandishing, it's just not, it's not applicable in this case, um, because there wasn't a pointing, um, in this case. I see that my time is up. Okay. Thank you. Thank you, Judge. All right. Thank you. Mr. Franklin. Franklin, uh, Mr. . . . I know you argued Fifth and Sixth Amendment, but this, uh, chronic thing took, took me by surprise because it's not cited in your brief. Your Honor, we, uh, filed a supplemental 28J letter. No, we, we have your argument. Your Honor, page 16 of our brief addresses the guiding hand of counsel in the proceedings against the defendant, Powell v. Alabama. Court held that the time between arraignment and trial is perhaps the most critical of the proceedings against the defendant and therefore, consultation, thorough investigate, thoroughgoing investigation and preparation are vitally important. We'd like to reiterate, reiterate again that here, Chum was denied the right to confer with and have the aid of his counsel. We need to start his clock running. Hmm. Huh. Chum was denied the right to confer with and have the aid of counsel and this is documented in the record by the motion for continuance and the statements made by his counsel on record. So, this is a, a case where he was denied, uh, he, the defense attorney was denied access to his client, said that he needed access to properly defend him and needed him to review the discovery. So, the core issue here is that Chum was denied access to his counsel and as a result, we believe that there was a denial of assistance of counsel in reverse. Okay. Thank you, sir. Thank you, uh, everyone, uh, Chip, Mr. Ross and Mr. Franklin.